UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| League of Minnesota Cities Insurance Trust and Minnesota Counties Insurance Trust, | Case No. 08-cv-5147 (JRT/AJB) |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | **Jury Demand** |
| Wells Fargo Bank, N.A., and John Does I-V, | |
| Defendants. | |

For their Amended Complaint against Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and John Does I-V, Plaintiffs League of Minnesota Cities Insurance Trust ("LMCIT") and Minnesota Counties Insurance Trust ("MCIT") allege as follows:

**OVERVIEW**

1.      LMCIT and MCIT, public entities, contracted with Wells Fargo to invest certain of their funds in instruments authorized by Minnesota law.  Wells Fargo illegally and fraudulently invested over $2.1 million of LMCIT's public funds and over $1.3 million of MCIT's public funds in a structured investment vehicle issued by a Cayman Islands company and co-issued by a Delaware limited liability company.  This investment violated the plain language of the Minnesota statute governing the investment of public funds, and was a breach of Wells Fargo's contractual, fiduciary and statutory duties to Plaintiffs.  Plaintiffs seek to rescind the purchase of the security, or alternatively, to recover damages for the losses suffered as a result of the unlawful investments.

## THE PARTIES

2.      LMCIT is a pooled, self-insurance entity, formed as an exercise of the governmental joint powers of its member cities pursuant to Minn. Stat. §§ 471.59, 471.98-.982 and 471.617, to enable member cities to obtain for themselves and for their employees various forms of risk protection.

3.      MCIT is a pooled, self-insurance entity, formed as an exercise of the governmental joint powers of its member counties and other associated public entities pursuant to Minn. Stat. §§ 471.59 and 471.98-.982 to enable members to obtain for themselves and for their employees various forms of risk protection.

4.      On information and belief, Defendant Wells Fargo Bank, N.A. is a national bank with offices in Minneapolis and throughout Minnesota.   It merged with Norwest Bank Minnesota, N.A. ("Norwest") in 1998, and is the successor in interest to Norwest with respect to the LMCIT contracts that are the subject of this action.

5.      John Does I-V were acting as agents and/or employees of Wells Fargo within the course, scope and authority of such relationship and, as a result, are jointly and severally liable for all acts alleged herein.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district because a substantial part of the events underlying Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

***Statutory Framework Governing LMCIT and MCIT Investments***

8.     To assure that LMCIT and MCIT are able to meet their responsibilities to pay members' defense and provide indemnification for claims, LMCIT and MCIT are charged with the responsibility of investing the public funds contributed by their members in investment instruments authorized by Minn. Stat. § 118A.

9.     Section 118A imposes an extensive and detailed regulatory framework governing public investments.  The statute restricts investment of LMCIT and MCIT funds to low-risk, marketable, liquid, highly-rated, short-term investments.

10.     Among other things, under Minn. Stat. § 118A.04, subd. 4, LMCIT and MCIT may invest in "commercial paper issued by United States corporations or their Canadian subsidiaries that is rated in the highest quality category by at least two nationally recognized rating agencies and matures in 270 days or less."

11.     Any investments of public funds made by Plaintiffs or their agents that violate the statutory restrictions in Section 118A are *ultra vires* and therefore are void *ab initio* as a matter of law.

***LMCIT's Agreements With Wells Fargo***

12.     On January 4, 1993, LMCIT and Norwest Bank entered into a Custody Agreement in which Norwest Bank agreed to provide custodian services for certain LMCIT securities.  Wells Fargo assumed all of Norwest Bank's obligations under the Custody Agreement.  A copy of the Custody Agreement is attached as Exhibit A.

3

13.     In or about October of 1993, Norwest Bank proposed securities lending as a new source of revenue for LMCIT and a means to offset custodial fees.   The Bank promoted securities lending as "an investment option that allows you to loan out the idle securities in your portfolio to selected borrowers, providing you with an additional source of revenue."   It promised that the collateral provided by borrowers in connection with securities lending transactions would be invested in "ERISA-Type Short-Term Investments," offering "principal protection," "high liquidity" and "diversification."

14.     On January 26, 1994, LMCIT and Norwest Bank entered into a Securities Lending Agreement.   Wells Fargo assumed all of Norwest Bank's obligations under the Securities Lending Agreement.   A copy of the Securities Lending Agreement is attached as Exhibit B.

15.     In the Securities Lending Agreement, Wells Fargo, as agent for LMCIT, may make LMCIT's securities available to approved borrowers.   The Securities Lending Agreement requires that each borrower post cash collateral in the amount of 102% of the market value of the loaned securities.

16.     The Agreement authorizes Wells Fargo to invest that cash collateral subject to the restrictions in Minnesota's public investing laws.   In this regard, the Securities Lending Agreement provides:

> Until given written notice of termination pursuant to Section 14 herein, Participant [LMCIT] hereby authorizes the Bank and Bank agrees to undertake the following:
>
> …

g.   To hold cash Collateral and invest it in the types of investment vehicles that meet the qualifications established in Minnesota Statute § 475.66, subd. 3 including amendments to the subdivision adopted after the date of this Agreement.  If Participant requests that the Bank is further restricted regarding the investment of cash collateral, Participant will add an Exhibit "B" which will be attached hereto and made a part hereof as though fully set forth here.

17.   Minnesota Statute Section 475.66 referenced in the Securities Lending Agreement was repealed in 1996 and replaced by Section 118A; therefore, Section 118A now sets forth the controlling investment restrictions.

18.   Under the terms of the Securities Lending Agreement, Wells Fargo and LMCIT share the earnings from the investment of cash collateral, with LMCIT receiving 60% of the earnings, and Wells Fargo receiving 40% of the earnings.

19.   The Securities Lending Agreement provides:

Bank agrees to indemnify and save and hold the Participant, Participant's agents, and the Participant's employees harmless from any and all claims or causes of action caused by the negligence, bad faith, or misconduct of the Bank or the Bank's agents or employees in the performance of this Agreement.

20.   LMCIT is authorized to enter into Securities Lending Agreements pursuant to Minn. Stat. § 118A.05, subd. 3, which states that collateral for securities lending transactions must be restricted to the securities described in Section 118A.

**MCIT's Agreements With Wells Fargo**

21.   On February 13, 2005, MCIT and Wells Fargo entered into a Custody Agreement in which Wells Fargo agreed to provide custodian services for certain MCIT securities.  A copy of the Custody Agreement is attached as Exhibit C.

22.     Also on February 13, 2005, MCIT and Norwest Bank entered into a Securities Lending Agreement.  A copy of the Securities Lending Agreement is attached as Exhibit D.

23.     In the Securities Lending Agreement, Wells Fargo, as agent for MCIT, may make MCIT's securities available to approved borrowers.  The Securities Lending Agreement requires that each borrower post cash collateral in the amount of 102% of the market value of the loaned securities.

24.     The Agreement authorizes Wells Fargo to invest that cash collateral in, for example, "U.S. treasuries and agencies, U.S. or Euro dollar certificates of deposit and time deposits, bankers acceptances, commercial paper, and other short term money market instruments," subject to the restrictions in Minnesota's public investing laws.  In this regard, the Securities Lending Agreement provides that "[t]his Agreement and all transactions hereunder shall be governed by, interpreted, construed and enforced in accordance with the laws of the State of Minnesota."

25.     The Agreement represents that "[t]he prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."

26.     Under the terms of the Securities Lending Agreement, Wells Fargo and MCIT share the earnings from the investment of cash collateral, with MCIT receiving 60% of the earnings, and Wells Fargo receiving 40% of the earnings.

27.     The Securities Lending Agreement provides that MCIT "assumes all risk of loss arising out of … collateral investment loss;" however, Wells Fargo "assumes the risk

of loss arising from negligent and fraudulent operation of its Securities Lending Program."

28.     MCIT is authorized to enter into Securities Lending Agreements pursuant to Minn. Stat. § 118A.05, subd. 3, which states that collateral for securities lending transactions must be restricted to the securities described in Section 118A.

***Wells Fargo's Investment of Plaintiffs' Public Funds in the Victoria Finance Security***

29.     Pursuant to the Securities Lending Agreements, Wells Fargo acted as Plaintiffs' investment manager with respect to collateral, exercising discretionary authority over the investment of LMCIT's and MCIT's collateral received in securities lending transactions.

30.     In May 2007, Wells Fargo invested over $2.1 million of LMCIT's cash collateral, and over $1.3 million of MCIT's cash collateral, in a so-called "commercial paper note" issued by Stanfield Victoria Finance Ltd. n/k/a Victoria Finance Ltd. ("Victoria Finance") and co-issued by its wholly-owned subsidiary, Stanfield Victoria Funding, LLC n/k/a Victoria Funding, LLC ("Victoria USA") (the "Victoria Finance Security" or "the Security").

31.     Victoria Finance is a limited liability company organized under the laws of the Cayman Islands.  It is not organized as a United States corporation.

32.     Victoria USA is a Delaware limited liability company.  It is not organized as a corporation.

33. Victoria USA has no employees or operations in the United States or else-where. The Private Placement Memorandum ("PPM") describes Victoria USA as follows on page 17:

> Victoria USA will not receive any portion of the proceeds realized from any offering of Senior Debt Securities, will not purchase or hold any Investments (and otherwise will not have significant assets other than its rights under certain Program Documents) and will not engage in any independent business activities. Victoria USA has agreed to co-issue the Senior Debt Securities solely as an accommodation to the Company and is not to receive any remuneration for so acting. The Company, in turn, has undertaken to Victoria USA to pay all expenses which Victoria USA may incur in connection with the Senior Debt Securities programs…

A copy of the PPM is attached as Exhibit E.

### *The Victoria Finance Structured Investment Vehicle Is Not U.S. Corporate Commercial Paper*

34. While the Victoria Finance Security was designated as a "commercial paper note," it was *not* commercial paper issued by a United States corporation as authorized by Section 118A.

35. Corporate commercial paper is a short-term promissory note issued in the open market as an obligation of the corporation. Commercial paper offers corporations a cheaper, more efficient alternative to a bank line of credit. Typically only corporations with high credit ratings and credit worthiness issue commercial paper. Proceeds from the issuance of corporate commercial paper are used for a corporation's current business operations, for example, finance inventories, accounts receivables and payrolls, or for day-to-day cash management.

36.     The Victoria Finance Security is an asset-backed security.  It is known as a structured investment vehicle ("SIV").

37.     Victoria Finance is an off-shore entity commonly referred to as a Special Purpose Entity ("SPE") or Special Purpose Vehicle ("SPV").

38.     SPEs/SPVs like Victoria Finance generally invest in portfolios of medium and long-term debt securities, and borrow money to fund the purchase of those assets by issuing short-term and medium-term notes, and one or more classes of subordinated notes.

39.     SIVs like Victoria Finance are formed to profit on the spread between the yield on the SIV's investment portfolio and its cost of funds, that is, to engage in interest rate arbitrage.

40.     Because SIVs borrow short term but invest long term, their debt frequently comes due before the underlying assets mature.  To survive, SIVs need regular infusions of new short-term refinancing at favorable rates.

41.     As stated in the Victoria Finance PPM:  "Noteholders will be exposed to liquidity risks because the Company generally intends to fund longer-term assets with short- or medium-term liabilities."

42.     By their nature, then, SIVs have built-in liquidity risks.

43.     The assets underlying the Victoria Finance Security are securities backed by, *inter alia,* mortgages, home equity loans, credit card debt, auto loans, student loans, small business loans and aircraft leases, some with maturities in excess of 10 years or more.

9

***An Enforcement Event Occurs When the Victoria Finance Security is Downgraded***

44.    Pursuant to Victoria Finance guidelines, within 10 days of the occurrence of one or more so-called "enforcement events," an "Enforcement Manager" must be appointed by the Collateral Agent, Deutsche Bank Trust Company Americas ("DBCTA"), to supervise the valuation and liquidation of the Victoria Finance investment portfolio. One such "enforcement event" is a ratings downgrade.

45.    In anticipation of a ratings downgrade, DBCTA sent out various notices to Wells Fargo and other senior debt holders (but not LMCIT and MCIT) beginning at least as early as mid-December 2007.

46.    A December 12, 2007, DBCTA notice sent to Wells Fargo stated that a number of investors were concerned that an immediate liquidation of Victoria Finance's portfolio of assets upon an enforcement event in the current market environment would not maximize recovery for senior debt holders, and presented senior debt holders with various options, among them (i) to have the existing liquidation procedures continue to apply, with the electing shareholders to receive proceeds from the sale of a pro rata share of the portfolio; or (ii) to become subject to alternative liquidation procedures by way of a restructuring/work-out.

47.    The December 12, 2007, notice set an election deadline of December 21, 2007.  That deadline was extended to December 28, 2007, and then to January 4, 2008, and then to January 17, 2008, according to various additional notices received by Wells Fargo (and not by LMCIT or MCIT).

48.     On January 4, 2008, well after Wells Fargo became aware of the potential downgrade of the Security and the options offered to senior debtholders, LMCIT and MCIT received a letter from Robert G. Smith, Senior Managing Director of Wells Fargo Securities Lending, advising that on December 21, 2007, Moody's had downgraded the senior debt ratings of all commercial paper notes issued by Victoria Finance due primarily to the deterioration of the market value of the asset portfolio held by Victoria Finance.  He noted that an enforcement event had been suspended, but would possibly occur on January 8.  He further noted that the pool in which LMCIT and MCIT was invested (along with three other public entities) holds $15 million (face value) of one issue of Victoria Finance with a February 15, 2008 maturity date.  The letter closed by stating that Wells Fargo would "communicate additional developments as we learn of them."

49.     An enforcement event with respect to the Victoria Finance Security occurred on January 8, 2008, arising, *inter alia*, from the Moody's rating on the Security falling below A-1/P-1.

***Wells Fargo Is Forced to Reveal That the Victoria Finance Security Is Not U.S. Corporation-Issued Commercial Paper and Does Not Comply With Section 118A***

50.     After receiving Mr. Smith's January 4, 2008 letter, LMCIT sought assurances that the Victoria Finance investment met the statutory requirements set forth in Section 118A.  LMCIT wrote to Wells Fargo on January 7, 2008, requesting confirmation that the Victoria Finance "commercial paper" was (1) rated in the highest

rating category by at least two nationally-recognized rating agencies and (2) was issued by a United States corporation or one of its Canadian subsidiaries.

51.     Wells Fargo's initial January 8, 2008 response was to reassure LMCIT that the Victoria Finance security was rated AAA by both S&P and Moody's at the time of purchase, and that the short-term ratings were A1+/P1.

52.     When Wells Fargo failed to address whether Victoria Finance is a U.S. corporation, LMCIT followed up with another email on January 8, 2008, asking Wells Fargo: "Could you please confirm whether Victoria Finance is a U.S. corporation?"

53.     Wells Fargo's response to the January 8, 2008, email was to forward a Bloomberg "description page" for the Security, which Wells Fargo wrote "shows this to be a U.S. Interest bearing Commercial paper."

54.     Given indications in the media that Victoria Finance is a Cayman Islands company, LMCIT sought further clarification in another January 8, 2008, email, writing: "I could use a little further clarification about what it means to be a U.S. Interest bearing commercial paper.  There are some indications that Victoria Finance is a Cayman Island entity.  Is there some sort of prospectus that we could review?"

55.     Wells Fargo responded by forwarding to LMCIT the Victoria Finance PPM and explaining:  "Victoria and most ABCP [Asset Backed Commercial Paper] programs issue out of a Delaware LLC, so technically it is a Cayman Islands based company issuing U.S. CP out of a Delaware based subsidiary."

56.     The Victoria Finance PPM was explicit that the Victoria Finance Security was issued by a Cayman Islands company, and co-issued by a Delaware LLC.  It was not commercial paper issued by a United States corporation.

57.     On or about January 11, 2008, LMCIT requested that Wells Fargo buy back LMCIT's Victoria Finance Security.  Wells Fargo rejected LMCIT's request that it buy back the Security.

58.     LMCIT directed Wells Fargo not to invest in any more commercial paper unless it was issued by a U.S.-domiciled corporation.

59.     LMCIT also requested that Wells Fargo keep it apprised of developments in the Victoria Finance matter as they occurred.

**Wells Fargo Continues to Keep LMCIT and MCIT in the Dark**

60.     Mr. Smith's January 4, 2008, letter was not forthcoming about the then-current situation with respect to the Victoria Finance Security.  For example, the January 4, 2008 letter never mentioned that LMCIT and MCIT had the option of liquidating the Security, as set forth in the December 12, 2007 Notice, among other Notices.

61.     Moreover, contrary to Wells Fargo's assurance that it would "communicate additional developments as we learn of them," Wells Fargo did not keep LMCIT or MCIT apprised of developments as they occurred.

62.     For instance, sometime prior to January 15, 2008, Wells Fargo made an election on behalf of LMCIT and MCIT not to apply the existing liquidation procedures but instead to become subject to alternative liquidation procedures by way of a restructur-

ing/work-out.  Wells Fargo never mentioned to LMCIT and MCIT that they had the option of liquidating the investment prior to making this election on their behalf.

63.    On January 15, LMCIT learned in the media—not from Wells Fargo—that there was a January 17, 2008 deadline for investors to elect whether to liquidate their share of the asset portfolio.  When LMCIT contacted Wells Fargo about its options, Wells Fargo advised that it had already made the election not to liquidate.

64.    MCIT did not learn that Wells Fargo had made an election not to liquidate the Security on its behalf until MCIT called upon Wells Fargo to report on the securities lending program—and specifically the Victoria Finance Security—at a February 2008 MCIT Board meeting.

***Wells Fargo Refused LMCIT's Demand to Rescind the Illegal Victoria Finance Investment***

65.    On March 19, 2008, LMCIT made a formal demand for rescission of the Victoria Finance transaction.

66.    On April 15, 2008, Wells Fargo rejected LMCIT's rescission demand.

67.    LMCIT provided Wells Fargo with formal notice of its termination of the Custody Agreement and the Security Lending Agreement on September 24, 2008.

68.    Wells Fargo demanded that LMCIT provide funds to redress the deficiency in the cash collateral account—a deficiency caused by Wells Fargo's investment of LMCIT funds in the Victoria Finance Security—in order to recall LMCIT's securities from borrowers.

*Wells Fargo Disregards MCIT's Instruction to Cease Securities Lending Activities*

69.     After receiving Mr. Smith's January 4, 2008 letter, MCIT requested that Wells Fargo representatives attend MCIT's February 8, 2008 Board meeting to discuss the status of its securities lending program.

70.     Wells Fargo representative Darcy Kent appeared in person at MCIT's February 8, 2008 Board meeting; Wells Fargo's Robert Smith and Mike Dougherty participated in the meeting via telephone.

71.     At the February 8, 2008 MCIT Board meeting, with the help of a Wells Fargo PowerPoint presentation, Wells Fargo reviewed the lending process outlining the benefits of participation.  It acknowledged that, in the collateral investment selection process, Wells Fargo has "specific investment guidelines for each collateral pool" and that it is obliged to "follow client guidelines or statutes when applicable" (as in the case of MCIT).

72.     Wells Fargo also outlined challenges presented by the market, and unveiled "Recent Strategic Investment Initiatives" with respect to collateral investments, including a "much restricted approved investment list" and "**No Structured Investment Vehicles (SIV's) or Asset Backed Securities (ABS)**."

73.     In describing the current status of the Victoria Finance Security at the February 8, 2008 meeting, Wells Fargo advised MCIT that "it is anticipated that [Victoria Finance] holders will be able to choose a new security, similar in structure to an asset-backed security, that will have a pass-through income stream of interest and principal."

74.     Wells Fargo further advised MCIT that: "We participate in a creditor's committee for this issue and are monitoring the situation carefully."

75.     It was at this meeting that MCIT learned that Wells Fargo had elected on MCIT's behalf—without first consulting MCIT—not to liquidate the Security.

76.     After Wells Fargo left the February 8, 2008 Board meeting, the Board voted to direct Wells Fargo (i) to suspend any new loans of MCIT securities; (ii) to suspend any further investment of collateral in Wells Fargo's possession; (iii) to liquidate all collateral investments as they mature and (iv) to return all encumbered securities to MCIT's account when they are available.

77.     In a letter dated February 15, 2008, MCIT directed Wells Fargo's Robert Smith (i) to suspend any new loans of MCIT securities; (ii) to suspend any further investment of collateral in Wells Fargo's possession; (iii) to liquidate all collateral investments as they mature and (iv) to return all encumbered securities to MCIT's account when they are available.

78.     MCIT's February 15, 2008 letter also expressed MCIT's concern and alarm about the position in which Wells Fargo had placed it:

> MCIT is extremely concerned with Wells Fargo's decision to invest the cash collateral received from the loan of MCIT's high quality securities in lesser quality assets.  … Wells Fargo's failure to report that MCIT's cash collateral had been replaced by lower grade securities prevented MCIT from reporting the true nature of its investment program to its auditors and stakeholders and may raise issues concerning MCITs compliance with statutory requirements and Wells Fargo's … performance under their agreements.

16

MCIT also is alarmed that Wells Fargo unilaterally elected to restructure rather than liquidate Victoria Financ[e] securities.  As the holder of the assets and the party "at risk" MCIT should have been consulted.

79.     On February 24, 2008, MCIT learned that Wells Fargo had not followed MCIT's instructions, but had instead continued to lend MCIT securities and to invest MCIT's collateral.

80.     During a telephone conference on February 29, 2008, Wells Fargo advised MCIT that prohibiting further investments would result in negative earnings.  On Wells Fargo's advice, to mitigate losses stemming from the Victoria Finance Security, MCIT agreed to certain limited securities lending activity (pending further Board direction).  In a February 29, 2008 email, Wells Fargo confirmed its understanding that it could "make new loans as old loans are returned" and "invest and reinvest the collateral in repo instruments [repurchase agreements] and no commercial paper for the MCIT account."

81.     The collateral on loan at the time of the February 29, 2008, telephone call was approximately $43 million.  Based on the conversation and Wells Fargo's confirming email, it was MCIT's understanding that the level of loan activity would remain at current levels and not increase.

82.     In a March 6, 2008, telephone call with Wells Fargo, MCIT learned that the collateral on loan had increased dramatically to $65 million, and that Wells Fargo has disregarded MCIT's instructions and loaned securities not already in the program.

83.     Again based on Wells Fargo's advice, and to mitigate its losses with respect to the Victoria Finance Security, MCIT agreed that Wells Fargo could continue to invest

its cash collateral in money markets and repurchase agreements authorized by Minn. Stat. § 118A.

84.     On May 22, 2008, MCIT provided Wells Fargo with notice of its termination of the Security Lending Agreement.

85.     Wells Fargo required that MCIT provide more than $1.3 million to redress the deficiency in the cash collateral account—a deficiency caused by Wells Fargo's investment of MCIT funds in the Victoria Finance Security—in order to recall MCIT's securities from borrowers.

***Victoria Finance Defaults***

86.     LMCIT was not repaid its more than $2.1 million investment or interest on the maturity date, February 15, 2008.

87.     MCIT was not repaid its more than $1.3 million investment or interest on the maturity date, February 15, 2008, or thereafter.

88.      The market price for the Victoria Finance assets (to the extent there is a market) is insufficient to pay off senior creditors.

89.     A potential restructuring of the Security contemplates unrated pass-through notes to be issued by a new Cayman Islands company and co-issued by a Delaware LLC.

90.     It is unknown when or how much LMCIT or MCIT will recover on the Victoria Finance investment.

## COUNT 1
### Section 10(b) of the 1934 Securities Exchange Act, Rule 10b-5 and
### Minn. Stat. § 80A Fraud - Suitability
### (Direct Liability—Wells Fargo and Does I-V)

91.     Plaintiffs hereby incorporate and reallege the allegations set forth above.

92.     The Victoria Finance security was an unlawful investment under Minn. Stat. § 118A and was otherwise an unsuitable investment of Plaintiffs' public funds.

93.     Defendants purchased the securities with an intent to defraud or with reckless disregard for Plaintiffs' interests.

94.     Defendants failed or refused to exercise their expertise and capabilities to evaluate the Victoria Finance investment to determine the lawfulness of the Victoria Finance security under Minn. Stat. § 118A, or its suitability generally, as required by NASD Rule 2310 and IM-2310-3.

95.     By the conduct, practices and activities described in this Amended Complaint, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 and Minn. Stat. § 80A.01 *et seq*.

96.     Accordingly, Plaintiffs are entitled to recover the consideration paid for the Victoria Finance Security, plus interest.

97.     LMCIT has tendered and hereby again tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

98.     MCIT hereby tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

99.     Alternatively, Plaintiffs are entitled to recover damages.

100.    Moreover, Plaintiffs are entitled to recover their attorneys' fees and costs.

**COUNT 2**
**Section 10(b) of the 1934 Securities Exchange Act, Rule 10b-5 and**
**Minn. Stat. § 80A - Fraud and Misrepresentation**
**(Direct Liability—Wells Fargo and Does I-V)**

101.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

102.    Defendants, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails or of the facility of a national securities exchange, in connection with the purchase or sale of securities, with knowledge or recklessness: (a) employed devices or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon Plaintiffs.

103.    Defendants falsely represented to Defendants that they would invest the cash collateral provided by borrowers in securities lending transactions only in investments authorized by Minnesota law.

104.    Defendants either (a) knew the Victoria Finance security was an unlawful investment for Plaintiffs, proceeded to make the investment and willfully omitted to so advise Plaintiffs, or (b) were reckless in failing to know the illegal nature of the Victoria Finance Security.

20

105.   Defendants failed to disclose to Plaintiffs that, contrary to Minn. Stat. § 118A.04, they were investing in a structured investment vehicle issued by a Cayman Islands company and a Delaware LLC in violation of Minnesota law, and failed to disclose the inherent risks associated with SIVs like the Victoria Finance Security—risks detailed in the Victoria Finance PPM.

106.   By the conduct, practices and activities described in this Amended Complaint, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 and Minn. Stat. § 80A.01 *et seq*.

107.   Accordingly, Plaintiffs are entitled to recover the consideration paid for the Victoria Finance security.

108.   LMCIT has tendered and hereby again tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

109.   MCIT hereby tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

110.   Alternatively, Plaintiffs are entitled to recover damages.

111.   Moreover, Plaintiffs are entitled to recover its attorneys' fees and costs.

### COUNT 3
### Controlling Person Liability and Respondeat Superior
### (Wells Fargo)

112.   Plaintiffs hereby incorporate and reallege the allegations set forth above.

113.   Wells Fargo is liable as a "control person" and under the common law theory of respondeat superior for the violations of Does I-V for directly or indirectly, by

use of the means or instruments of interstate commerce or of the mails, or of the facility

of a national securities exchange, in connection with the purchase or sale of securities,

with knowledge or recklessness: (a) employed devices or artifices to defraud; (b) made

untrue statements of material fact or omitted to state material facts necessary to make the

statements made, in light of the circumstances under which they were made, not mis-

leading or (c) engaged in acts, practices or courses of business which operated as a fraud

or deceit upon Plaintiffs.

114.    Wells Fargo also is liable as a control person because it controlled Does I-V

and had the ability to control or in fact controlled the Victoria Finance transaction at

issue.

115.    By the conduct, practices and activities described in this Amended

Complaint, Wells Fargo is liable for the primary violations of Does I-V due to its position

as a control person pursuant to Section 20(a) and Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 and Minn. Stat.

§ 80A.01 *et seq*.

## COUNT 4
## Respondeat Superior
## (Wells Fargo)

116.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

117.    Wells Fargo is vicariously liable for the acts and omissions of Does I-V

because Does I-V were acting within the work-related limits of their duties as to both

time and place, and because the conduct of Does I-V was reasonably foreseeable given

the nature of their employment and duties.

118.   Wells Fargo is vicariously liable for Does I-V's primary violation pursuant to Minnesota common law of respondeat superior.

**COUNT 5**
**Failure to Supervise**
**(Wells Fargo)**

119.   Plaintiffs hereby incorporate and reallege the allegations set forth above.

120.   Wells Fargo violated NASD Rule 3010 and other applicable securities laws, regulations and the NASD Rules, by failing to supervise Does I-V in a manner that would ensure that Plaintiffs' investments are consistent with its investment objectives and the statutory restrictions set forth in Minn. Stat. § 118A.

121.   Plaintiffs thereby suffered damages, in an amount to be proven at trial.

**COUNT 6**
**Breach of Contract**
**(Wells Fargo)**

122.   Plaintiffs hereby incorporate and reallege the allegations set forth above.

123.   By the conduct, practices and activities described in this Amended Complaint, including violating the investment restrictions imposed on Plaintiffs pursuant to Minn. Stat. § 118A, Wells Fargo breached the Plaintiffs' Securities Lending Agreements.

124.   Plaintiffs were damaged as a result of Wells Fargo's breaches.

125.   Wells Fargo's breaches were material, and Plaintiffs are therefore entitled to rescind the Victoria Finance transaction.

126.   LMCIT has tendered and hereby again tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

127.   MCIT hereby tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

128.   Alternatively, Plaintiffs are entitled to recover damages.

**COUNT 7**
**Breach of Fiduciary Duty—Common Law and Minn. Stat. § 45.026**
**(Wells Fargo and Does I-V)**

129.   Plaintiffs hereby incorporate and reallege the allegations set forth above.

130.   Defendants held themselves out as having expertise in securities lending and collateral reinvestment.

131.   Plaintiffs reposed their trust and confidence in Defendants by virtue of Defendants' superior knowledge and expertise, and Defendants knew that Plaintiffs were relying on their expertise.

132.   Defendants had possession of and control over Plaintiffs' cash collateral.

133.   Defendants owed Plaintiffs a duty to invest Plaintiffs' public funds in accordance with the fiduciary standards of care, skill and judgment generally applicable to the investment of such public funds.

134.   Defendants' investment of Plaintiffs' funds in the Victoria Finance Security did not satisfy fiduciary standards of care, skill and judgment.

135.   Defendants breached their fiduciary duties to Plaintiffs by, without limitation:

(a)     Purchasing the Victoria Finance Security without undertaking adequate due diligence to determine the nature of the security and whether it met Plaintiffs' investment objectives or violated the restrictions set forth in Minn. Stat. § 118A;

(b)     Withholding material information from Plaintiffs concerning the nature and status of the Victoria Finance Security; and

(c)     Concealing their misconduct from Plaintiffs.

136.    Defendants further breached their fiduciary duties to MCIT by failing and refusing to honor its instructions to cease securities lending activities.

137.    As a result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered the loss of use of their public funds and may suffer the permanent loss of all or much of those funds.

138.    LMCIT has tendered and hereby again tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

139.    MCIT hereby tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

140.    Alternatively, Plaintiffs are entitled to recover its damages.

**COUNT 8**
**Doctrine of Ultra Vires—Rescission of Contract**
**(Wells Fargo and Does I-V)**

141.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

142.    Wells Fargo's purchase of the Victoria Finance Security as the agent of Plaintiffs was unlawful and *ultra vires*.

143.    By reason of the foregoing, Plaintiffs are entitled to rescission of the Victoria Finance transaction.

144.    LMCIT has tendered and hereby again tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

145.     MCIT hereby tenders the Victoria Finance Security, in exchange for the return of its investment plus interest from the date of the investment.

### COUNT 9
### Common Law Fraud
### (Wells Fargo and Does I-V)

146.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

147.    The conduct, practices and activities described in this Amended Complaint constitute common law fraud.

148.    Defendants falsely represented that they would invest Plaintiffs' collateral only in investments authorized by Minnesota law.

149.    Defendants either (a) knew the Victoria Finance security was an unlawful investment for Plaintiffs, proceeded to make the investment and willfully omitted to so advise Plaintiffs, or (b) were reckless in failing to know the illegal nature of the Victoria Finance Security.

150.    Defendants intentionally or recklessly concealed material information relating to the investment of Plaintiffs' collateral, including without limitation, that they

invested Plaintiffs' cash collateral in risky, illiquid securities that were not authorized by Minnesota law.    Defendants failed to disclose to Plaintiffs that, contrary to Minn. Stat. § 118A.04, they were investing in a structured investment vehicle issued by a Cayman Islands company and a Delaware LLC in violation of Minnesota law, and failed to disclose the inherent risks associated with SIVs like the Victoria Finance Security—risks detailed in the Victoria Finance PPM.

151.   Defendants intended that Plaintiffs relied on them to counsel and inform Plaintiffs with respect to the investment of Plaintiffs' collateral, and Plaintiffs justifiably relied on Defendants.

152.   Plaintiffs suffered damages as a result of Defendants' fraud, in an amount to be proven at trial.

## COUNT 10
### Negligent Misrepresentation
### (Wells Fargo and Does I-V)

153.   Plaintiffs hereby incorporate and reallege the allegations set forth above.

154.   The conduct, practices and activities of Defendants described in this Amended Complaint constitute negligent misrepresentation.

155.   Defendants owed Plaintiffs a duty of reasonable care in communicating information to Plaintiffs about their collateral investments.

156.   Plaintiffs relied on Defendants to counsel and inform Plaintiffs with respect to the investment of Plaintiffs' collateral, and Plaintiffs justifiably relied on Defendants.

157.   Defendants failed to exercise due care in communicating with Plaintiffs regarding such investments.

158.    Defendants failed to disclose material information relating to the investment of Plaintiffs' collateral, including without limitation, that they invested Plaintiffs' cash collateral in risky, illiquid securities that were not authorized by Minnesota law.

159.    Specifically, Defendants failed to disclose to Plaintiffs that, contrary to Minn. Stat. § 118A.04, they were investing in a structured investment vehicle issued by a Cayman Islands company and a Delaware LLC in violation of Minnesota law, and failed to disclose the inherent risks associated with SIVs like the Victoria Finance Security—risks detailed in the Victoria Finance PPM.

160.    Plaintiffs suffered damages as a result of Defendants' negligent misrepresentation, in an amount to be proven at trial.

### COUNT 11
### Negligence
### (Wells Fargo And Does I-V)

161.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

162.    At all times relevant to this Amended Complaint, Defendants owed Plaintiffs a duty to exercise reasonable care, skill and diligence.

163.    By the conduct, practices and activities described in this Amended Complaint, Defendants failed to exercise reasonable care, skill and diligence in identifying lawful and suitable investments for Plaintiffs, and were negligent in investing Plaintiffs' public funds in an unlawful and unsuitable investment.

164.    Plaintiffs thereby suffered damages, in an amount to be proven at trial.

## COUNT 12
## Indemnification
## (Wells Fargo)

165.    Plaintiffs hereby incorporate and reallege the allegations set forth above.

166.    In the LMCIT Securities Lending Agreement, Wells Fargo promised to "indemnify and save and hold [LMCIT] harmless from any and all claims or causes of action caused by the negligence, bad faith, or misconduct of the Bank or the Bank's agents or employees in the performance of this Agreement."

167.    This obligation is not limited by its terms to claims or causes of action asserted by third parties and, in fact, extends to claims asserted by LMCIT.

168.    Similarly, in the MCIT Securities Lending Agreement, Wells Fargo "assume[d] the risk of loss arising from negligent and fraudulent operation of its Securities Lending Program."

169.    MCIT's losses include its investment losses resulting from the Victoria Finance Security, as well as its attorneys' fees and costs incurred in this action.

170.    Accordingly, Plaintiffs are entitled to be indemnified by Wells Fargo for all of their losses, attorneys' fees and costs in connection with the conduct, practices and activities described in this Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment in their favor and against Defendants, jointly and severally, as follows:

A.    Rescinding the Victoria Finance transaction and ordering the return of LMCIT's investment funds in an amount of over $2.1 million, plus interest from the date

of purchase of the Victoria Finance security to the present at the Minnesota statutory rate; and

      B.     Rescinding the Victoria Finance transaction and ordering the return of MCIT's investment funds in an amount of over $1.3 million, plus interest from the date of purchase of the Victoria Finance security to the present at the Minnesota statutory rate; or alternatively,

      C.     Awarding a money judgment in favor of Plaintiffs, and against Defendants, in an amount to be determined at trial; and

      D.     Awarding Plaintiffs' costs and attorneys' fees; and

      E.     Granting any relief the Court deems just and proper under the circumstances of the case.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues triable of right by a jury.

Dated:  October 29, 2008          **GREENE ESPEL, P.L.L.P.**

                         s/ Jeanette M. Bazis
                        Clifford M. Greene, Reg. No. 37436
                        Jeanette M. Bazis, Reg. No. 255646
                        200 S. Sixth Street, Suite 1200
                        Minneapolis, MN  55402
                        cgreene@greeneespel.com
                        jbazis@greeneespel.com
                        (612) 373-0830

                        Attorneys for Plaintiffs League of Minnesota
                        Insurance Trust and Minnesota Counties
                        Insurance Trust