# EXHIBIT E

# PRIVATE PLACEMENT MEMORANDUM
## Stanfield Victoria Finance Ltd.
(Incorporated with limited liability in the Cayman Islands)
## Stanfield Victoria Funding, LLC
(A Delaware limited liability company)
### $10,000,000,000 Commercial Paper Notes
### Private Placement of Commercial Paper Notes with Maturities up to 270 Days

Stanfield Victoria Finance Ltd., a Cayman Islands company (the "Company"), and Stanfield Victoria Funding, LLC, a Delaware limited liability company that is a wholly-owned subsidiary of the Company ("Victoria USA" and, together with the Company, the "Issuers"), are jointly offering commercial paper notes ("Notes") under an issuance program (the "Program") under which the Issuers may have outstanding at any one time up to $10,000,000,000 principal amount of Notes. The Notes will have maturities of up to 270 days and will be issued in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof. The Notes will be issued in book-entry form through The Depository Trust Company and will be sold in transactions exempt from registration under Section 4(2) of the Securities Act of 1933, as amended.

The Company will use the net proceeds of the Notes to finance and maintain its investment in highly-rated asset-backed securities, bonds, notes and other financial assets that satisfy specified criteria. Victoria USA is jointly issuing the Notes with the Company solely as an accommodation to the Company and, except as described herein, will not receive any portion of the offering proceeds.

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND SALES OF THE NOTES MAY BE MADE ONLY TO INVESTORS THAT ARE BOTH QUALIFIED PURCHASERS AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), AND QUALIFIED INSTITUTIONAL BUYERS AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT (EACH, AN "APPROVED INVESTOR"). EACH PURCHASER OF A NOTE WILL BE DEEMED TO HAVE REPRESENTED AND AGREED AS FOLLOWS: (1) THE PURCHASER UNDERSTANDS THAT THE NOTES ARE BEING ISSUED ONLY IN TRANSACTIONS NOT INVOLVING ANY PUBLIC OFFERING WITHIN THE MEANING OF THE SECURITIES ACT; (2) THE PURCHASER (I) IS AN APPROVED INVESTOR, (II) IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS IN LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (III) IS NOT A PARTICIPANT-DIRECTED EMPLOYEE PLAN, SUCH AS A 401(K) PLAN OR A TRUST FUND HOLDING THE ASSETS OF SUCH A PLAN; (IV) IS PURCHASING SUCH NOTE FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF AN INVESTOR THAT ALSO QUALIFIES AS AN APPROVED INVESTOR; (V) IS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE COMPANY OR VICTORIA USA (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS ITSELF AN APPROVED INVESTOR); (VI) WILL HOLD AT LEAST $500,000 MINIMUM DENOMINATION OF NOTES; AND (VII) WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS ON SUCH NOTE TO ANY SUBSEQUENT TRANSFEREE OF SUCH NOTE; (3) IF IN THE FUTURE THE PURCHASER DECIDES TO SELL SUCH NOTE PRIOR TO MATURITY, IT WILL BE SOLD ONLY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ONLY TO (I) A PLACEMENT AGENT FOR THE NOTES IDENTIFIED BY THE COMPANY WHICH ITSELF IS AN APPROVED INVESTOR (EACH, AN "AUTHORIZED PLACEMENT AGENT") OR THROUGH AN AUTHORIZED PLACEMENT AGENT TO AN INVESTOR IDENTIFIED BY AN AUTHORIZED PLACEMENT AGENT AS AN APPROVED INVESTOR OR (II) A PURCHASER THAT IS AN APPROVED INVESTOR IN A TRANSACTION THAT MEETS THE REQUIREMENTS OF RULE 144A; (4) THE PURCHASER UNDERSTANDS THAT, ALTHOUGH AN AUTHORIZED PLACEMENT AGENT MAY REPURCHASE NOTES, NO AUTHORIZED PLACEMENT AGENTS ARE OBLIGATED TO DO SO, AND ACCORDINGLY THE PURCHASER (OR ANY SUCH OTHER INVESTOR) SHOULD BE PREPARED TO HOLD SUCH NOTE UNTIL MATURITY; (5) THE PURCHASER ACKNOWLEDGES THAT THE NOTES SOLD TO THE PURCHASER BY AN AUTHORIZED PLACEMENT AGENT MAY BE SOLD TO IT PURSUANT TO RULE 144A; (6) THE PURCHASER UNDERSTANDS THAT ANY SALE TO A PERSON WHO IS NOT AN APPROVED INVESTOR WILL BE NULL AND VOID TO THE EXTENT PERMITTED BY APPLICABLE LAW; AND (7) THE PURCHASER WILL CERTIFY UPON REQUEST THAT THE PURCHASER IS AN APPROVED INVESTOR AND UPON THE FAILURE TO PROVIDE SUCH CERTIFICATION, THE PURCHASER SHALL BE REQUIRED TO EITHER TRANSFER ITS NOTES TO AN INVESTOR THAT IS AN APPROVED INVESTOR OR TO PERMIT THE COMPANY TO REDEEM SUCH NOTES.

### Commercial Paper Ratings*
Standard & Poor's Ratings Services: A-1+
Moody's Investors Service, Inc.: P-1

* Ratings are not a recommendation to purchase, hold or sell Notes. The ratings are based upon current information furnished to the rating agencies by the Issuers and information obtained by the rating agencies from other sources. The ratings are only accurate as of the date hereof and may be changed, superseded or withdrawn as a result of changes in, or unavailability of, such information, and therefore a prospective purchaser should check the current ratings before purchasing the Notes.

## Merrill Lynch Money Markets Inc.
### JULY 24, 2002

GW0 07242

The information set forth herein was obtained from sources which we believe reliable, but we do not guarantee its accuracy. Neither the information, nor any opinion expressed, constitutes a solicitation by us of the purchase or sale of any instruments. The information contained herein will not typically be distributed or updated upon each new sale of CP Notes, although the information will be distributed from time to time. Further, the information herein is not intended as substitution for the investor's own inquiry into the creditworthiness of Stanfield Victoria Funding, LLC and Stanfield Victoria Finance Ltd. and, if applicable, another party providing credit support for the CP Notes, and investors are encouraged to make such inquiry.

*This Private Placement Memorandum is furnished by the Issuers in connection with an offering exempt from registration under the Securities Act for the exclusive purpose of enabling prospective investors to consider the purchase of the Notes described herein. Any reproduction or distribution of this Private Placement Memorandum, in whole or in part, and any disclosure of its contents or use of any information herein for any purpose other than considering an investment in the Notes is prohibited, except to the extent such information is otherwise publicly available. Each offeree of the Notes, by accepting delivery of this Private Placement Memorandum, agrees to the foregoing.*

THE NOTES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT REVIEWED THIS DOCUMENT OR CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED ("RSA 421-B") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**No invitation may be made to the public in the Cayman Islands to purchase the Notes.**

No person has been authorized to give any information or to make any representations other than those contained in this Private Placement Memorandum, and, if given or made, such information or representations must not be relied upon as having been authorized. This Private Placement Memorandum does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities to which it relates.

Neither the delivery of this Private Placement Memorandum nor any sale hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Company, Victoria USA or any other person since the date hereof or thereof or that the information contained herein or in any other document containing information supplied in connection with this offering is correct as of any time subsequent to its date.

All references to "United States dollars" or "$" in this Private Placement Memorandum refer to currency of the United States of America.

## DOCUMENTS INCORPORATED BY REFERENCE

All supplements and amendments to this Private Placement Memorandum, including the most recent audited consolidated annual accounts of the Company as published subsequently from time to time shall be deemed to be incorporated in, and to form a part of, this Private Placement Memorandum; provided, however, that any statement contained herein or in any such annual accounts, supplement or amendment shall be deemed to be

modified or superseded for the purpose of this Private Placement Memorandum to the extent that a statement contained in any subsequent annual accounts or in any subsequent supplement or amendment hereto modifies or supersedes such statement.

The Company will provide, without charge, upon oral or written request, a copy of any or all of the documents which or portions of which are incorporated herein by reference. Written or oral requests for such documents should be directed to the Company c/o Stanfield Global Strategies LLC, 330 Madison Avenue, New York, New York 10017, telephone (212) 583-7400, Attention: David Carroll, Partner.

## ADDITIONAL INFORMATION

Each prospective purchaser is hereby offered the opportunity to ask questions of, and receive answers from, the Company, Victoria USA and the Placement Agents concerning the terms and conditions of the offering of the Notes and to obtain additional reasonable information, to the extent the Issuers possess such information or can acquire the same without unreasonable effort or expense. Inquiries concerning such additional information should be directed to Merrill Lynch Money Markets Inc., 4 World Financial Center -- 11th Floor, New York, New York 10080, Attn: Marketing Department, telephone (212) 449-0296, facsimile (212) 449-8939 or the Company c/o Stanfield Global Strategies LLC, 330 Madison Avenue, New York, New York 10017, telephone (212) 583-7400, Attention: David Carroll, Partner.

While the Notes remain outstanding, the Issuers will make available, upon request, to any holder and any prospective purchaser designated by such holder, information satisfying the requirements of Rule 144A(d)(4) under the Securities Act. Any such request should be directed to the Company at its address above.

Copies of the Company's Memorandum and Articles of Association, Victoria USA's Limited Liability Company Agreement and the Cayman Management Agreement (as defined herein) may be inspected at the offices of the Depositary (as defined herein). See "Description of the Notes—Covenants."

## CERTAIN CONSIDERATIONS RELATING TO THE CAYMAN ISLANDS

The Company is an exempted company incorporated with limited liability under the laws of the Cayman Islands. As a result, it may not be possible for investors to effect service of process upon the Company within the United States or to enforce against the Company in United States courts judgments predicated upon the civil liability provisions of the securities laws of the United States. The Company has been advised by its Cayman Islands legal advisers, Maples and Calder, that the courts of the Cayman Islands are unlikely (i) to recognize or enforce against the Company judgments of courts of the United States predicated upon the civil liability provisions of the securities laws of the United States or any State thereof and (ii) in original actions brought in the Cayman Islands, to impose liabilities against the Company predicated upon the civil liability provisions of the securities laws of the United States or any State thereof, on the grounds that such provisions are penal in nature. However, in the case of laws that are not penal in nature, although there is no statutory right to enforcement in the Cayman Islands of judgments obtained in the United States, the courts of the Cayman Islands will recognize and enforce a judgment of a foreign court of competent jurisdiction without retrial on the merits based on the principle that a judgment of a foreign court imposes upon the judgment debtor an obligation to pay the sum for which judgment has been given; provided, that such judgment (a) is final and conclusive, (b) is for a liquidated sum, not in respect of taxes or a fine or penalty, (c) is not inconsistent with a Cayman Islands judgment in respect of the same matter, and (d) was not obtained in a manner, and is not of a kind the enforcement of which is contrary to the public policy of the Cayman Islands (awards of punitive or multiple damages may well be held to be contrary to public policy). A Cayman Islands court may stay proceedings if concurrent proceedings are being brought elsewhere. The Company has appointed CT Corporation System, 111 Eighth Avenue, New York, New York 10011 as its agent for service of process in the United States.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Documents Incorporated by Reference | ii |
| Additional Information | iii |
| Certain Considerations Relating to the Cayman Islands | iii |
| Program Summary | 1 |
| Investment Considerations | 8 |
| Use of Proceeds | 10 |
| Description of the Notes | 10 |
| The Issuers | 16 |
| Investment Eligibility Criteria | 18 |
| Compliance Tests | 24 |
| The Administration Agreement | 30 |
| The Investment Advisor | 31 |
| The Investment Advisory Agreement | 32 |
| The Security Agreement | 34 |
| Certain U.S. Federal Income Tax Consequences | 41 |
| Certain Cayman Islands Tax Consequences | 43 |
| Plan of Distribution | 44 |
| Transfer Restrictions | 45 |
| Certain Legal Matters | 47 |
| Annex A—Index to Defined Terms | A-1 |

**PROGRAM SUMMARY**

*The following summary does not purport to be complete and is taken from, and is qualified in its entirety by, the remainder of this Private Placement Memorandum. An index to certain defined terms used in this Private Placement Memorandum is attached as Annex A hereto.*

| | |
|---|---|
| Issuer: | Stanfield Victoria Finance Ltd. (the "Company") is an exempted company incorporated with limited liability under the laws of the Cayman Islands for the purpose of issuing, from time to time, Debt Securities (as defined below), and investing the proceeds thereof in highly rated asset-backed securities, bonds, notes and other financial assets as described herein. See "The Issuers—Stanfield Victoria Finance Ltd." and "Investment Eligibility Criteria." |
| Co-Issuer: | Stanfield Victoria Funding, LLC, a Delaware limited liability company ("Victoria USA" and, together with the Company, the "Issuers"). The Company is the sole member of Victoria USA. Victoria USA will not receive any portion of the offering proceeds and will not have any material assets. See "Use of Proceeds" and "The Issuers—Victoria USA." |
| Securities Offered | Commercial paper notes ("Notes") having maturities not exceeding 270 days from the original issue date. |
| Debt Securities: | Concurrently with the Notes offering described herein, the Issuers will from time to time jointly issue and sell medium-term notes ("Medium Term Notes" and, together with the Commercial Paper Notes, the "Senior Debt Securities") in the United States. The Company will also from time to time issue and sell its subordinated capital notes ("Capital Notes" and, together with the Senior Debt Securities, the "Debt Securities") both within and outside of the United States. |
| Program Size: | The aggregate principal amount of Notes outstanding at any one time will not exceed $10,000,000,000 (or such other limit as the Issuers may hereafter establish in accordance with the Program Documents (as defined herein)). The aggregate principal amount of Debt Securities, together with the aggregate principal amount of Euro Debt Securities (as defined below), outstanding at any one time will not exceed $10,000,000,000 or the equivalent thereof in other currencies (or such other limit as the Issuers may hereafter establish in accordance with the Program Documents). |
| Use of Proceeds: | The Company will use the net proceeds of the Notes primarily to purchase Assets (as defined below) and to repay maturing Debt Securities. Subject to the terms of the Security Agreement (as defined below), the Company may also use the net proceeds of the Notes to pay other Company obligations. See "Use of Proceeds." |
| Redemption: | The Notes cannot be redeemed prior to their stated maturity dates other than:<br><br>(i) after the occurrence of an Enforcement Event (any such redemption, a "Mandatory Redemption"); |

1

|                        |       |                                                                                                                                                                                                                                                                                                                         |
|------------------------|-------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                        | (ii)  | at the option of the Company if necessary for either of the Issuers to comply with the Investment Company Act (any such redemption, a "Regulatory Redemption"); or                                                                                                                                                      |
|                        | (iii) | at the option of the Company if the Company becomes obligated to pay any Gross-Up Amounts (as defined herein) on the Notes (any such redemption, a "Tax Redemption" and, together with any Mandatory Redemption or Regulatory Redemption, a "Redemption");                                                              |

in each case upon the Company giving not less than the relevant period of notice (which notice shall be irrevocable) on the relevant date or dates specified prior to the date fixed for redemption and for the relevant early redemption amount described therein. There will be no acceleration of the Notes before their respective stated maturity dates, if any, except pursuant to a Redemption. See "Description of the Notes."

Eligible Investments:................................ The Administrative Agent will determine on each Business Day which of the Assets and Hedge Contracts (each defined herein) held by the Company (together, the "Investments") constitute "Eligible Investments". To qualify as an Eligible Investment, each Asset must on the date of purchase and on each Business Day thereafter satisfy the Individual Asset Criteria summarized below (other than certain ratings criteria which apply only on the date the Asset is purchased). In addition, an Asset or Hedge Contract will qualify as an Eligible Investment during the Operating Period (as defined below) only if, on the date of determination, the Company's portfolio of Investments (the "Investment Portfolio") satisfies the Eligible Investment Portfolio Criteria summarized below. To the extent that an Asset or Hedge Contract does not meet these requirements, it will not be considered an Eligible Investment and the Company's capital will be allocated against this credit exposure on a 1:1 basis. Accordingly, the Issuers may only issue Senior Debt Securities against that portion of the Investment Portfolio which consists of Eligible Investments.

(i) Individual Asset Criteria:

The Company is permitted to invest in bonds, notes and other debt securities (including, for these purposes, any shares or interests in non-United States money market funds) and asset-backed securities which, at the time of purchase, satisfy the individual asset criteria outlined in the Company's Investment Policy (the "Investment Policy"). The Investment Policy requires each asset purchased by the Company (other than certain short-term instruments) to be rated at least A- by Standard & Poor's Ratings Services ("S&P") and at least A3 by Moody's Investors Service, Inc. ("Moody's", and together with S&P, the "Rating Agencies") on the purchase date (subject to a limited exception for certain assets rated by only one Rating Agency). Each short-term asset purchased by the Company must be rated A-1+/P-1 (or, in the case of money market funds, AAA/Aaa) by S&P and Moody's, respectively. The Investment Policy further requires each asset to be denominated in an Approved OECD Currency (as defined herein) and to satisfy various other criteria, including, among others, that the Company be able to hedge its investment in the asset and to prepare daily mark-to-market valuations under

|  |  |
|---|---|
|  | procedures approved by the Rating Agencies. Any asset purchased by the Company which satisfies all of the foregoing criteria (the "Individual Asset Criteria") constitutes an "Asset." See "Investment Eligibility Criteria—Individual Asset Criteria." |
|  | (ii) Eligible Investment Portfolio Criteria: |
|  | The Company will also be required during the Operating Period to comply with certain limitations on the Investment Portfolio that are intended to maintain credit quality and diversification levels appropriate to the leverage of the Company. These limitations (the "Eligible Investment Portfolio Criteria") are calculated with regard to the Current Market Value of each Asset and each Hedge Contract on each Business Day. The "Operating Period" will commence on the earlier of (i) the first day on which the Current Market Value of the Investment Portfolio exceeds $1,000,000,000 and (ii) the date six months from the date on which the Company first issues Capital Notes (the "Closing Date"), and will end on the earlier of (x) the first day on which any Enforcement Event occurs, and (y) the first day on which all outstanding Debt Securities have been paid in full. See "Investment Eligibility Criteria—Eligible Investment Portfolio Criteria." |
| Compliance Tests: | The Administrative Agent (as defined below) will on each Business Day perform a series of financial calculations to determine the Company's exposure to market and liquidity risk and the Company's capital adequacy. See "Compliance Tests." Any failure by the Company to satisfy these financial tests for specified periods will impose certain limitations on the Company's operations and/or result in an Enforcement Event. See "The Security Agreement" and "Program Termination" below. |
| Depositary: | Deutsche Bank Trust Company Americas (the "Depositary"). |
| Form of Notes: | The Notes will be issued in book-entry form through the facilities of The Depository Trust Company ("DTC"). |
| Currency: | The Notes will be denominated in United States dollars. |
| Denomination: | The Notes are being offered in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof. |
| Offering Price: | Par, less a discount representing an interest factor or, in the case of interest-bearing Notes, par. |
| Settlement: | Unless otherwise agreed to, same day basis, in immediately available funds. |
| Transfer Restrictions: | The Notes are being offered in a private placement exempt from registration under the Securities Act. In addition, the Issuers are relying on the exemption from registration under the Investment Company Act provided by Section 3(c)(7) thereof ("Section 3(c)(7)"). In furtherance of these exemptions, at no time may the Notes be owned by any person other than persons who are both "qualified institutional buyers" (as defined in Rule 144A under the Securities Act |

3

|  |  |
|---|---|
|  | ("Rule 144A")) and "qualified purchasers" (as defined for purposes of Section 3(c)(7)) ("Approved Investors"). Offers to purchase and subsequent transfers of Notes will be subject to this restriction, and an investor's ability to resell the Notes may therefore be limited. Any sale or attempted transfer of a Note to a person who is not an Approved Investor will be deemed null and void to the extent permitted by law. The Company may also, in its discretion, redeem the Notes of any holder of Notes who is not an Approved Investor or who otherwise holds the Notes in violation of the applicable transfer restrictions or compel any such holder to transfer the Notes to an Approved Investor. See "Description of the Notes—Redemption of Notes—Regulatory Redemption" and "Transfer Restrictions." |
| Medium Term Notes: | The Issuers may from time to time, at their option, issue Medium Term Notes having maturities of at least 271 days. Any Medium Term Notes will rank *pari passu* with the Notes. The Medium Term Notes are not being offered through this Private Placement Memorandum. |
| Liquidity Agreements: | The Company will from time to time enter into loan agreements (the "Liquidity Agreements") with banks and/or other financial institutions (collectively, the "Liquidity Banks"), pursuant to which the Company may borrow funds ("Loans") for specified purposes. Each Liquidity Bank is required to have short-term debt ratings of A-1+ and P-1 from S&P and Moody's, respectively, or otherwise be approved by the Rating Agencies, at the time it becomes a party to a Liquidity Agreement. The Company will execute one or more Liquidity Agreements on the Closing Date. The Company's obligation to repay any Loans made by the Liquidity Banks, to pay interest thereon and to pay liquidity commitment fees will rank *pari passu* with the Notes. See "Compliance Tests – Liquidity Criteria – The Liquidity Agreements" and "The Security Agreement." |
| Hedge Counterparties: | The Company is required to maintain compliance with certain hedging criteria stated in the Investment Policy and, to that end, will enter into hedge contracts ("Hedge Contracts") with counterparties that satisfy specified criteria ("Hedge Counterparties"). Each Hedge Counterparty must have short-term debt ratings of A-1+ and P-1, or long-term debt ratings of at least BBB- and Baa3, from S&P and Moody's, respectively, on each occasion on which it executes a Hedge Contract. The Company's obligations to the Hedge Counterparties under the Hedge Contracts (other than in respect of indemnities) will rank *pari passu* with the Notes. See "The Security Agreement." |
| Capital Notes: | The Company will from time to time issue Capital Notes having maturities of at least 365 days. The Capital Notes will be subordinate in right of payment to the Notes and the other Senior Obligations (as defined herein) of the Issuers. See "The Issuers—Stanfield Victoria Finance Ltd." and "The Security Agreement." The Capital Notes are not being offered through this Private Placement Memorandum. |
| Administrative Agent: | Deutsche Bank Trust Company Americas (the "Administrative Agent"). The Administrative Agent is generally responsible for administering the day-to-day operations of the Company including, without limitation, performing certain financial tests set forth in the Investment Policy. See "The Administration Agreement." |

| | |
|---|---|
| Investment Advisor: | Stanfield Global Strategies LLC (the "Investment Advisor"). The Investment Advisor provides specified investment management and related services to the Company. See "The Investment Advisory Agreement." |
| Cayman Manager: | QSPV Limited (the "Cayman Manager"). |
| Collateral Agent: | Deutsche Bank Trust Company Americas (the "Collateral Agent"). |
| Placement Agents: | Bank of Montreal<br>Credit Suisse First Boston Corporation<br>J.P. Morgan Securities Inc.<br>Merrill Lynch Money Markets Inc. (together, the "Placement Agents") |
| Security Agreement: | Pursuant to a security agreement (the "Security Agreement") among the Company, Victoria USA and the Collateral Agent, the Company has granted the Collateral Agent a security interest in the Investments and certain accounts held by the Collateral Agent on the Company's behalf, and each of the Company and Victoria USA has granted the Collateral Agent a security interest in its rights under the Program Documents (collectively, the "Collateral") for the benefit of the holders of the Debt Securities, the Administrative Agent, the Manager, the Depositary, the Liquidity Banks, the Hedge Counterparties, the Collateral Agent and certain other persons (collectively, the "Secured Parties"). The Security Agreement further sets forth the relative payment priorities of the Issuers' obligations to the Secured Parties. Under these provisions, the Notes, the Medium Term Notes, the Company's obligations to the Liquidity Banks in respect of outstanding Loans and liquidity commitment fees and the Company's obligations to Hedge Counterparties (other than in respect of indemnities) (collectively, the "Priority Obligations") rank *pari passu* and are senior to all of the Issuers' other obligations (except that any fees and expenses due to the Collateral Agent or certain of its agents following the occurrence of an Enforcement Event will be senior to the Priority Obligations). See "The Security Agreement." |
| Program Termination: | The Collateral Agent will exercise full control over the Investment Portfolio from and after the occurrence of an Enforcement Event and will supervise the repayment of the Issuers' obligations in accordance with the terms of the Security Agreement. The Issuers may not issue any further Debt Securities after any Enforcement Event occurs. An Enforcement Event will occur (i) if the Company (a) fails for five or more consecutive Business Days to satisfy certain of the Compliance Tests, (b) fails to make timely payment on any Senior Debt Security, Loan or Hedge Contract (subject to specified grace periods), or (c) fails to maintain S&P and Moody's ratings of at least A-1/P-1, respectively, for the Notes and AA-/Aa3 for the Medium Term Notes (unless such ratings are withdrawn other than for credit-related reasons), (ii) if either Issuer becomes subject to specified bankruptcy events, or (iii) if certain other events occur. See "The Security Agreement." |
| Limitation on Victoria USA Activities: | The Senior Debt Securities will be issued jointly by the Company and Victoria USA. Victoria USA will not receive any portion of the proceeds realized from any offering of Debt Securities, will not purchase or hold any Investments and will not otherwise have any material assets. |

5

| | |
|---|---|
| Euro Debt Securities: | In addition to offering Capital Notes and Senior Debt Securities, the Company may hereafter commence separate offerings of commercial paper notes and/or medium term notes outside of the United States (collectively, the "Euro Debt Securities"). Any Euro Debt Securities, if issued, will rank *pari passu* with the Senior Debt Securities. The Company's obligations to any financial institutions which provide liquidity support to the Company in relation to any Euro Debt Securities will rank *pari passu* with the Company's obligations to the Liquidity Banks, and the Company expects its obligations to any persons who provide services to the Company in relation to any Euro Debt Securities (including any dealer, issuing agent or paying agent for the Euro Debt Securities) to rank *pari passu* with the Company's obligations to the corresponding service provider for the Debt Securities. The aggregate principal amount of Debt Securities and Euro Debt Securities outstanding at any one time will not exceed $10,000,000,000 or the equivalent thereof in other currencies (or such other limit as the Issuers may hereafter establish in accordance with the Program Documents). The Company will not, however, issue any Euro Debt Securities unless it first obtains written confirmation from each Rating Agency that the sale of Euro Debt Securities will not cause it to downgrade or withdraw its rating of any Debt Securities then rated by it. Each purchaser of Notes, by accepting the same, is deemed to authorize the Company to execute such amendments to the Program Documents, and such other agreements and instruments, as the Company deems to be necessary or appropriate in connection with the commencement of the Euro Debt Securities programs. The Euro Debt Securities are not being offered through this Private Placement Memorandum. |
| Tax Considerations: | All payments in respect of the Notes will be made without deduction for or on account of Cayman Islands withholding taxes unless such deduction is required by applicable law. In the event that a withholding tax is imposed by the Cayman Islands or any political subdivision thereof on payments of interest or principal on the Notes, the Company will pay to any Note holder such additional amounts as may be necessary so that every net payment made by the Company on such Note after deduction or withholding for or on account of such tax will not be less than the amount then due and payable on such Note. If the Company becomes required to pay any such additional amounts on the Notes it will be entitled to redeem the Notes in whole or in part in a Tax Redemption. See "Description of the Notes—Redemption of Notes—Tax Redemption." Cayman Islands counsel have confirmed that currently no deduction or withholding is required to be made from any payments of interest or principal by the Company to holders of Notes by reason of any taxes, duties, assessments or governmental charges imposed or levied by or on behalf of any Cayman Islands authorities. Any prospective holder of Notes should review and consider the section "Certain U.S. Federal Income Tax Consequences" below. |
| Investment Considerations: | Any prospective holder of Notes should review and consider the section "Investment Considerations" below. |
| Governing Law: | The Notes, the Depositary Agreement, the Security Agreement and the other Program Documents (other than the Cayman Management Agreement (as defined herein)) are each governed by the laws of the |

6

| | |
|---|---|
| | State of New York. The Cayman Management Agreement is governed by the laws of the Cayman Islands. |
| Ratings: | The Notes have been rated A-1+ by S&P and P-1 by Moody's. These ratings were confirmed by S&P as of July 17, 2002, and by Moody's as of July 18, 2002, with the understanding that the Rating Agencies would continue to monitor the credit of the Company. The ratings of the Notes address the ability of the Company to make payments due to Noteholders in the event that an Enforcement Event occurs. They do not address the probability of an Enforcement Event actually occurring. These ratings are subject to revision or withdrawal at any time, and there is no assurance that they will remain unchanged. A rating reflects only the views of the assigning Rating Agency and is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time. |

## INVESTMENT CONSIDERATIONS

The Issuers advise prospective holders of Notes to consider the following matters before deciding to purchase any Notes:

### Limited Recourse

The Issuers will not have any significant assets other than the Collateral and each holder of a Note, by accepting its Note, is deemed to agree that the Notes are payable only from the Collateral and only in accordance with the enforcement and payment procedures stated in the Security Agreement. See "The Security Agreement." The Notes do not constitute obligations of, and have not been guaranteed by, any person other than the Issuers. Accordingly, if, following the occurrence of an Enforcement Event, any amounts remain unpaid on the Notes after all of the Collateral has been applied in accordance with the Security Agreement, the holders of Notes will not have recourse for the unpaid amounts against the Issuers, the Investment Advisor, the Placement Agents or any other person and all claims of the holders to recover such amounts will be extinguished.

### Exposure to Risks of the Company

The holders of Notes will be exposed to the risks of the Company's investment program. The potential risks include credit risk, market risk, liquidity risk and operational risk.

#### *Credit Risk*

The holders of Notes will be exposed to credit risk relating both to Assets purchased by the Company and to Hedge Contracts entered into with Hedge Counterparties. The Company will not be subject to the portfolio diversification requirements of the Investment Policy until the Operating Period commences. Accordingly, during the Ramp-Up Period (as defined herein), the Investment Portfolio may entail credit exposure to only a limited number of obligors. See "The Issuers" and "Investment Eligibility Criteria—Eligible Investment Portfolio Criteria."

Credit defaults or credit rating downgrades of the Investments, to the extent they occur, may adversely affect the Company's ability to comply with the Capital Adequacy Criteria and, in certain circumstances, the Liquidity Criteria (each as defined herein). For a description of such tests, see "Compliance Tests." A failure by the Company to satisfy the Capital Adequacy Criteria or Liquidity Criteria could result in an Enforcement Event.

#### *Market Risk*

Since the Company may purchase Assets in a variety of currencies and with a variety of interest rate benchmarks, holders of Notes could be exposed to risks resulting from fluctuations in interest rates and currency exchange rates. To hedge these exposures, the Company will enter into Hedge Contracts in accordance with procedures designed to reduce interest rate, basis and currency exchange rate risk. There can be no assurance, however, that such Hedge Contracts will eliminate all such risks. See "Compliance Tests—Hedging Criteria." A failure by the Company to follow the required hedging procedures could trigger an Enforcement Event.

Decreases in the market value of the Company's Investments may adversely affect the Company's ability to comply with the Capital Adequacy Criteria. Any failure by the Company to comply with the Capital Adequacy Test for five consecutive Business Days would result in an Enforcement Event.

#### *Liquidity Risk*

Noteholders will be exposed to liquidity risks because the Company generally intends to fund longer-term assets with short- or medium-term liabilities. The Company will address these risks by managing the Assets and its liabilities in compliance with the Liquidity Criteria set forth in the Investment Policy. See "Compliance Tests—Liquidity Criteria." The Company is not, however, required to match the maturities of the Notes with those of any underlying Assets, and the Company will not maintain sufficient liquidity facilities to support the repayment of all outstanding Notes. Accordingly, if the Company, for any reason, is unable to fund the repayment of maturing Notes

through the sale of additional Debt Securities or Asset sales, it may be unable to pay such Notes whether or not the Company is then in compliance with the Investment Policy.

### *Operational Risk*

The Company has no operating history and there can be no assurance that the Company will be able to operate at a profit or to achieve its financial goals. In addition, the Company's business operations will be highly dependent upon services provided by the Investment Advisor under the Investment Advisory Agreement. The Investment Advisor commenced operations in 1999 and, although it has structured the Program, the Medium Term Notes program and the Company's Capital Notes program (collectively, the "Debt Programs") and developed the financial models that will be used to implement the Compliance Tests, and although certain of the Investment Advisor's officers have experience in the management of complex investment portfolios, the Investment Advisor itself has not managed any structured investment vehicles. There can be no assurance that the officers or principals of the Investment Advisor will not change. Any failure by the Investment Advisor to manage the Company's business in accordance with the Compliance Tests could result in an Enforcement Event.

The Company's business operations under the Debt Programs will also be highly dependent upon the performance by the Administrative Agent of its duties under the Administration Agreement. Among other matters, the Administrative Agent will perform the calculations required to determine whether the Company is in compliance with the Compliance Tests and will supervise the Company's receipt of payments on the Investments and the payment by the Company of its liabilities. The Administrative Agent has delegated certain of its duties under the Administration Agreement to the Investment Advisor as its sub-administrative agent.

### *Downgrades of Senior Debt Securities*

The ongoing operations of the Company are highly dependent upon the credit ratings assigned by the Rating Agencies to the Senior Debt Securities. At their launch, the Program and the Medium Term Note program were awarded the highest long-term and short-term ratings (as applicable) by the Rating Agencies. If, however, S&P reduces the Note ratings to below A-1+, or S&P or Moody's, respectively, reduces the Medium Term Note ratings to below AAA or Aaa, the Company's funding costs will likely increase and its ability to make required payments on the Notes may be impaired. If the downgrade is severe enough (including any downgrade by S&P of the Notes to a rating below A-1 or any downgrade by Moody's of the Notes to a rating below P-1), or if S&P or Moody's withdraws its rating of any Senior Debt Securities for credit-related reasons, an Enforcement Event will occur. See "The Security Agreement—Enforcement Events."

### **Conflicts of Interest Involving the Investment Advisor, the Placement Agents and Certain Related Parties**

Various actual or potential conflicts of interest could arise between the Investment Advisor and/or its members, partners, employees, related persons and clients under management (the Investment Advisor and each such person or party, an "Advisory Related Party"), on the one hand, and the holders of the Notes, on the other. The Advisory Related Parties may invest, on behalf of themselves and other clients, in debt obligations that would be appropriate investments for the Company. The Advisory Related Parties may have ongoing relationships with the obligors of Assets owned by the Company, may own securities of any such obligor and may provide advisory or other services to any such obligor for fees. An Advisory Related Party also may sell, or arrange sales of, Assets to the Company and may serve as a general partner, manager or investment advisor of companies that employ the same investment strategy as the Company. As a result, the Advisory Related Parties may have interests in relation to any Asset or obligor, or in relation to any such sales of Assets to the Company, that are different from, or adverse to, the Company's interests. The Investment Advisor also could be restricted in effecting transactions in an Asset on the Company's behalf if, by reason of the activities of the Advisory Related Parties, the Investment Advisor is deemed to have access to material non-public information concerning the Asset obligor.

One or more Advisory Related Parties may purchase Capital Notes at any time following the Closing Date. In addition, one or more Advisory Related Parties intend on the Closing Date to enter into a total rate of return swap or other derivative contract under which such Advisory Related Party will acquire (i) the right to the economic interest of Capital Notes expected to represent approximately 49.9% of the aggregate principal amount of Capital Notes outstanding as of the Closing Date (the "Reference Capital Notes"), and (ii) the right to control the exercise of

rights in connection with such Reference Capital Notes. The Reference Capital Notes are expected to be purchased directly by the swap or derivative counterparty (which is expected to be a Placement Agent that is also a Liquidity Bank or an affiliate thereof). At the termination of the swap or derivative contract, the Reference Capital Notes may be transferred to the Advisory Related Party or another third party.

Circumstances could also arise in which the interests of the Placement Agents could be in conflict with the interests of the holders of the Notes. The Placement Agents or their respective affiliates may originate Assets to be included in the Investment Portfolio, may sell, or arrange sales of Assets to, the Company, may enter into Hedge Contracts with the Company and may otherwise engage in transactions with the Company that are permitted by the Program Documents. The Placement Agents and their respective affiliates may perform various investment banking, commercial banking and financial advisory services from time to time for each Issuer and its affiliates. Affiliates of the Placement Agents may be lenders to the Issuers, and proceeds from sales of the Notes may be used to repay indebtedness owed to such lending affiliates. Prospective purchasers of the Notes are advised that the Placement Agents have no obligation to disclose any non-public information concerning the Issuers and their affiliates that may be furnished to the Placement Agents and their respective affiliates in connection with performing such services.

**Changes in Tax Law**

An Asset will be eligible for purchase by the Company if, at the time of purchase, the payments thereon are not subject to withholding tax. However, there can be no assurance that, as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, payments on the Assets would not in the future become subject to withholding taxes imposed by the United States or another jurisdiction. In the event that the issuers (and the guarantors, if any) of such Assets were not then required to make "gross-up" payments that cover the full amount of any such withholding taxes, the amounts available to the Company to make payments on the Notes would accordingly be reduced. There can be no assurance that remaining payments on the Assets would be sufficient to make timely payments of interest and principal to the holders of the Notes.

## USE OF PROCEEDS

The net proceeds of the Notes offering will be used primarily to purchase Assets and to repay maturing Debt Securities. Subject to the terms of the Security Agreement, the net proceeds of the Notes offering may also be applied to pay any amounts the Company owes to the Liquidity Banks, the Administrative Agent, the Depositary, the Placement Agents, the Hedge Counterparties, the Collateral Agent or certain other persons.

## DESCRIPTION OF THE NOTES

The following summary of certain provisions of the Notes does not purport to be complete and is subject to, and qualified in its entirety by reference to, the actual provisions of the Notes, the Depositary Agreement and the Security Agreement.

**General**

The Issuers will issue the Notes through Deutsche Bank Trust Company Americas, as issuing agent, paying agent and depositary (the "Depositary"). The Notes will have maturities of not more than 270 days, will be discount or interest-bearing obligations, will rank *pari passu* with the other Priority Obligations and will be issued in a minimum denomination of $500,000 and integral multiples of $1,000 in excess thereof. The Notes will be issued in book-entry form as described below.

Each Note will be represented by a master note (the "Master Note") registered in the name of Cede & Co., as nominee for DTC or a successor or nominee thereof. The Master Note will be deposited with the Depositary on behalf of and as custodian for DTC or a successor thereof (which successor must be a clearing agency registered under the Securities Exchange Act of 1934, as amended, if so required by applicable law). Each Note represented by the Master Note is hereinafter referred to as a "Book-Entry Note", and the term "Note," as used in this Private